## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Debra Womack,                               Civil No. 07-2111 (DWF/AJB)

          Plaintiff,

v.                                       **MEMORANDUM**
                                         **OPINION AND ORDER**

RCM Technologies (USA), Inc.,
A foreign corporation, and James
Schappert, President, Information
Technology, a division of RCM
Technologies (USA), Inc.,

          Defendants.

---

Robert M. McClay, Esq., McClay & Alton, counsel for Plaintiff.

Gina K. Janeiro, Esq., David J. Duddleston, Esq., and Thomas E. Marshall, Esq., Jackson Lewis LLP, counsel for Defendants.

---

## INTRODUCTION

This matter is before the Court upon the Motion for Summary Judgment brought by RCM Technologies (USA), Inc. ("RCM") and James Schappert ("Schappert," and together with RCM, "Defendants").  For the reasons set forth below, the Court grants in part and denies in part Defendants' motion.

## BACKGROUND

RCM is a New Jersey company with an office in Eden Prairie, Minnesota.

According to RCM, it provides staffing and recruitment services for informational

technology, business solutions, and professional engineering projects.  Schappert was RCM's Senior Vice-President of the Information Technology Consulting Group from May 2005 until June 2008.

Plaintiff Debra Womack ("Womack") was hired as a Sales Director at RCM in February 2005.  In September 2005, Womack was diagnosed with cancer and she notified RCM that she needed disability leave because of her condition and treatment.  At that time, Womack did not qualify for leave under the Family and Medical Leave Act ("FMLA") and so she took other disability leave in accordance with RCM's policy.

In late December 2005, Randy Mueller ("Mueller"), Womack's supervisor, sent an e-mail to two people, including Schappert, indicating Mueller's intent to reorganize RCM's Minnesota office.  In particular, Mueller stated that he intended to eliminate Womack's position and reassign her as an Account Executive, a sales person position.  Mueller noted that the decision was based on the financial performance of the branch.  At the same time, however, Mueller stated that due to Womack's cancer diagnosis, she would not have the "energy" to fight cancer and also meet the performance expectations for the Sales Director position.  (Doc. No. 138 ¶ 2, Ex. 3b.)  Mueller also stated his belief that Womack was "only productive 50% of the time" and that this would continue for some time as she would need the "'time' to administer the cancer treatments along with required recovery stages."  (*Id.*)

In January 2006, Womack's position as Sales Director was eliminated, and she was made an Account Executive.  As an Account Executive, Womack was required to service a particular business category or territory and create a client base to sell RCM's

services.  This change in Womack's position did not alter her salary.  RCM also told

Womack that the company "greatly appreciate[d] [her] hard work and efforts over the

course of the past year."  (Doc. No. 126 ¶ 5, Ex. 3.)

In February 2006, Womack became eligible for FMLA leave.  In March 2006,

Womack requested and received intermittent FMLA leave.  According to RCM's records,

Womack requested full-time FMLA leave on April 24, 2006.  On April 25, 2006, Mueller

requested that he be able to transition all of Womack's accounts to other RCM

employees.  Mueller questioned Womack's performance, noting that she had not met her

minimum performance expectations while using "intermittent FMLA/PTO."  (*Id.* ¶ 11,

Ex. 9.)

Womack was out of the office on FMLA leave from April 24, 2006 until July 4,

2006.  On June 30, 2006, Womack sent an e-mail regarding her plan to return to work, in

which she noted that she needed to return to work part-time.  She proposed returning to

work 20 hours per week for six weeks and 30 hours per week for the following six

months.  In response, RCM told Womack that it had no part-time positions and that

"though it would be a financial burden" for RCM, it would work with her to get her back

to work and productive.  (Doc. No. 126 ¶ 16, Ex. 14.)  One of the requirements outlined

for Womack upon her return was a prohibition on her sharing details regarding her health

condition at work.  Womack was also told she was required to communicate her

whereabouts, including expected hours of work, to her manager.

RCM also proposed compensation and sales quota plans based on Womack's

reduced hours.  RCM proposed to pay Womack 50% of her salary and draw while she

worked half-time.  RCM also proposed two options for when she began working 30 hours per week, based upon a $1.2 million sales quota Womack had proposed during RCM's 2006 planning process.  These options were for Womack to identify a level of performance of up to $100,000 per month, or a pro rata calculation of her $1.2 million sales quota, and RCM would pay her in accordance with that percentage.  Alternatively, she could accept a 75% sales quota and a 75% salary and draw.

RCM and Womack then engaged in negotiations regarding the accounts Womack was to be assigned and the sales quota she would be required to attain.  Mueller felt that Womack should be required to identify a sales quota and explain her plan to meet that goal.  Womack, on the other hand, felt that she should be able to identify the accounts she was to service and their expected revenue before committing to a quota.

Womack's accounts had been reassigned when she went on FMLA leave and upon her return she proposed a list of accounts she wished to service.  Her proposed list was not approved.  According to e-mails generated at that time, the accounts on Womack's list were identified as Vendor Management System, or VMS accounts, and these accounts had been assigned to RCM's recruiting team such that RCM no longer assigned those accounts to Account Executives.  In the record before the Court for this matter, however, RCM contends that Womack's accounts were not reassigned to her "for legitimate business reasons – to ensure continuous full-time service while Womack worked" part-time.  (Doc. No. 128 ¶ 41.)  Womack contends that she was the only Account Executive in the branch to whom VMS accounts were not assigned.

Womack and RCM negotiated back and forth regarding the compensation plan and account list but were unable to reach a resolution.  Womack sent an e-mail on August 1, 2006, indicating that she would resign.  Womack stated she felt RCM's goals for her were unreasonable because her pre-existing revenue had been reassigned and RCM expected her to build a cold territory "from scratch" without adequate compensation.  (Doc. No. 126 ¶ 21, Ex. 19.)  Womack also noted that there was an "on-going climate of hostility" toward her at RCM.  (*Id.*)

Womack now asserts claims against the Defendants alleging violations of the FMLA.  Womack also asserts a claim against the Defendants for constructive discharge under Minnesota law.

## DISCUSSION

### I.     Standard of Review

Summary judgment is proper if there are no disputed issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated, "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. *Enter. Bank*, 92 F.3d at 747. The nonmoving party must demonstrate the existence of specific facts in the record that create a genuine issue for trial. *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995). A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials but must set forth specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.    FMLA

In enacting the FMLA, Congress was concerned about "inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods" and sought to "promote stability and economic security." 29 U.S.C. § 2601(a)(4) & (b)(1). Therefore, the FMLA entitles eligible employees to take leave from work when they must be absent from work for medical reasons. 29 U.S.C. § 2612(a)(1). The FMLA allows such an employee to take up to twelve weeks of leave during any twelve-month period for certain family or medical reasons including "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). Generally, violations of the FMLA fall into two types of claims: (1) "interference claims" in which an employee alleges that an employer denied or interfered with her substantive rights under the FMLA and (2) "retaliation claims" in which the employee alleges that the employer

discriminated against her for exercising her rights under the FMLA.  *Stallings v.*

*Hussmann Corp.,* 447 F.3d 1041, 1050 (8th Cir. 2006); 29 U.S.C. § 2615(a)(1) & (2).

**A.     Interference Claim**

Womack asserts an interference claim under the FMLA because she contends that

she was not placed in the same or an equivalent position when she returned to work from

her FMLA leave.  Defendants counter that Womack cannot assert an interference claim

because, upon her return, she was unable to work full-time, which Defendants contend

was an essential function of her job as an Account Executive.

The FMLA provides that, upon return from FMLA leave, an employee must be

restored to the position of employment she held when the leave began or to an equivalent

position with equivalent benefits, pay, and other terms and conditions of employment.

29 U.S.C. § 2614(a).  FMLA regulations state that "[i]f the employee is unable to

perform an essential function of the position because of a physical or mental condition,

including the continuation of a serious health condition, the employee has no right to

restoration to another position under the FMLA," though the employer's obligations may

be governed by the Americans with Disabilities Act ("ADA").  29 C.F.R. § 825.214(b).

Unlike the ADA, the FMLA does not include a reasonable accommodation provision.

29 C.F.R. § 825.702(a) (stating that "the leave provisions of the [FMLA] are wholly

distinct from the reasonable accommodation obligations of employers covered under the

[ADA]").  The FMLA requires an examination of whether the employee can perform the

essential functions of a position within her current environment.  *Duty v. Norton-Alcoa*

*Proppants*, 293 F.3d 481, 495 (8th Cir. 2002).  If the employee cannot perform the

essential functions of the job at the time the employee's FMLA leave has expired, the employee cannot maintain a job restoration claim under the FMLA.  *Hatchett v. Philander Smith College*, 251 F.3d 670, 677 (8th Cir. 2001).

Womack asserts that Defendants failed to return to her certain accounts she serviced before her FMLA leave began.  Womack contends that instead of returning these accounts, on which she had based her revenue generation requirements before her leave, Defendants directed her to choose new accounts from a list of clients no other Account Executive serviced and for which there was little or no sales activity.  According to Womack, it would have been impossible for her to meet her sales targets servicing these accounts.  Womack argues that, instead of earning her former compensation, she might have ended up owing RCM money had she been assigned these accounts.  Womack also contends that being directed to service these accounts, rather than her former clients, was a directive that she go "dumpster diving."  (Doc. No. 126 ¶ 3, Ex. 1 at 307.)

An employee returning from leave is entitled to a position that is "virtually identical to the employee's former position in terms of pay, benefits, *and working conditions, including privileges, perquisites and status*."  29 C.F.R. 825.215(a) (emphasis added).  The job to which the employee returns "must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  *Id.*  Therefore, it is possible to state a claim of interference under the FMLA where an employee's job responsibilities are altered upon return from leave in ways other than the most tangible, such as job title, salary and benefits.  *See, e.g., Connor v. Sun Trust Bank*, 546 F. Supp. 2d 1360 (N.D. Ga. 2008) (employee raised an

issue of fact as to whether she was returned to the same or an equivalent position when her supervisory responsibilities had been transferred away and her number of direct reports reduced); *Cooper v. Olin Corp.*, 246 F.3d 1083, 1091-92 (8th Cir. 2001) (holding that, where the plaintiff retained title, salary, and benefits of locomotive engineer but was assigned office work, "the restoration of salary, title, and benefits does not necessarily constitute restoration to the same position . . . when the job duties and essential functions of the newly assigned position are materially different from those of the employee's pre-leave position").

In *Johnson v. Campbell Mithun*, a court in this district held that an issue of material fact existed regarding whether an employee was restored to the same or an equivalent position when she was removed from advertising accounts on which she worked before her leave.  401 F. Supp. 2d 964 (D. Minn. 2005).  In *Johnson*, the plaintiff asserted that she had substantially less work to do upon her return from leave, that the work that she was given was very low-level, and that higher-level work was available but not given to her.  *Id*. at 972.  Similarly, RCM's removal of Womack's accounts and direction to generate work from accounts where there was little or no sales activity could constitute interference with Womack's right of restoration.

In order for Womack to state such a claim, however, she must show she was entitled to be restored to the same or an equivalent position, and to do that she must show she was able to perform the essential functions of that job.  Defendants contend Womack fails to make this showing because it is undisputed that Womack was unable to work full-time when she returned to work.  Instead, Womack requested an accommodation

under the ADA to work half-time for six weeks upon her return and to work 30 hours per week for several months after that.  Defendants contend that the Account Executive position required full-time work and that a full-time schedule was an essential function of the job.

For some jobs, working full-time or filling a particular schedule is an essential function of the position.  *See, e.g., Baker v. Hunter Douglas Inc.*, 270 Fed. Appx. 159 (3d Cir. 2008); *Voskuil v. Environmental Health Ctr. – Dallas*, No. 3:96-CV-0683-D, 1997 WL 527309 (N.D. Tex. Aug. 18, 1997).  For instance, in *Tardie v. Rehabilitation Hospital of Rhode Island*, the court decided that the plaintiff had no right to job restoration under the FMLA when she was no longer able to work 50 to 70 hours per week at the time she returned to work from FMLA leave.  6 F. Supp. 2d 125 (D.R.I. 1998).  The court determined that working such hours was an essential function of the plaintiff's job as a human resources director because the position required that the plaintiff be available twenty-four hours per day and seven days a week, she was frequently required to be present at the facility during some portion of all three shifts and, prior to going on leave, the plaintiff often returned to the facility after going home in the evening to handle issues after business hours.  *Id*. at 128, 132.

Even so, the Court does not conclude that full-time work is, as a matter of law, an essential function of all positions.  Determining the essential functions of a particular job necessarily requires some degree of case-by-case analysis since the functions of different jobs vary from one another, and the FMLA and applicable regulations do not make a return to full-time work a prerequisite for relief.  The Eighth Circuit has considered

several cases in which employees sought to return to work less than full-time after an

FMLA leave, and in each case the Eighth Circuit concluded that the plaintiffs failed to

establish they could perform the essential functions of their jobs while working part-time.

*Hatchett*, 251 F.3d at 676; *Reynolds v. Phillips & Temro Indus., Inc.*, 195 F.3d 411 (8th

Cir. 1999).  In those cases, however, the plaintiffs were unable to perform essential

functions necessary to their jobs apart from the number of hours they worked.  *Hatchett*,

251 F.3d at 674, 676 (noting that employee's job required holding monthly meetings,

attending seminars, and meeting with students, but at the end of her FMLA leave the

employee could only work on one-on-one projects, became confused and emotionally

upset when she was faced with conflict, and was recommended not to confer with

students or attend staff or other large meetings); *Reynolds*, 195 F.3d at 414 (stating that

employee could not perform essential functions when he was unable to lift up to

100 pounds, lift substantial weight above his head, climb, and remain on his feet all day,

and his position regularly required these activities).

The record contains some evidence that full-time work was required, or at least

contemplated, for Womack's position.  For instance, when Womack returned to work she

acknowledged that RCM had no permanent part-time positions, and she requested a

salary calculation based on a 50-hour work week.  (Doc. No. 126 ¶ 18, Ex. 16; ¶ 14,

Ex. 12.)  The record also contains evidence, however, suggesting that essential functions

of the Account Executive position were not measured by the number of hours worked per

week.  For instance, the record reflects that RCM expected all Account Executives to

make three "starts" per month.  (Doc. No. 138 ¶ 2, Ex. 3m.)  Further, in response to an

e-mail in which Womack noted her office hours for that day, Mueller responded in an

e-mail stating:

> As you know, sales professionals do not normally work "shifts" or "split shifts" as you mention.  Sales professionals "sell" whenever and whereever [sic] possible – totally dictated by the client and the client's calendar and availability to meet with the sales professional (before business hours, during business hours, after business hours).  A sales professional does not work normal "office" hours like a [sic] office worker or a manufacturing worker, etc.  Ultimately, sales professionals [sic] metrics will dictate success (or lack of success).  Did the sales professional sell the company's services/products or didn't they?  It is very clear how sales professionals are measured.  RCM is no different in measuring the success of sales professionals – RCM's sales metric, as you know, is 3 starts a month and 5 new requirements a week (qualified).  These are the metrics all sales professionals at RCM are held accountable to.

(*Id.* ¶ 2, Ex. 5g.)  Mueller's e-mail to Womack went on to state that Womack was "being

held accountable for sales/quota" and noted:  "In reality, you shouldn't been [sic] in the

office anyway if you are out selling and meeting with your clients."  (*Id.*)

Womack also contends that, had she been reassigned her pre-FMLA leave

accounts, she could have adequately serviced these accounts while working less than

full-time.  According to Womack, she had long-standing relationships with clients, built

over years as a salesperson at different firms, and that the client contacts at these firms

were invested in her success.  Further, there is no evidence in the record suggesting that,

upon her return from FMLA leave, Womack was unable to perform the essential

functions of a sales person position apart from the number of hours she was to work.  For

instance, there is no evidence that she was unable to arrange and hold client meetings, or

use the telephone or computer to communicate with clients.

Therefore, the record contains conflicting evidence regarding whether a full-time schedule was an essential function of Womack's sales person job as an Account Executive.  At this stage of the case, the Court must weigh the evidence and draw reasonable inferences in the light most favorable to Womack.  *Enter. Bank*, 92 F.3d at 747.  The court concludes that there are material issues of disputed fact regarding whether Womack could perform essential functions of job within her reduced schedule and whether RCM interfered with her right to reinstatement by refusing to reassign Womack's pre-FMLA accounts back to her.

### B. Retaliation Claim

The FMLA prohibits employers from discriminating against an employee for asserting her rights under the FMLA.  *Darby v. Bratch,* 287 F.3d 673, 679 (8th Cir. 2002); 29 U.S.C. § 2615(a)(2)).  "This prohibition necessarily includes consideration of an employee's use of FMLA leave as a negative factor in an employment action." *Darby*, 287 F.3d at 679.  Basing an adverse employment action on an employee's use of leave is, therefore, actionable.  *Smith v. Allen Health Sys., Inc.,* 302 F.3d 827, 832 (8th Cir. 2002).

Where there is no direct evidence of retaliation, FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework.  *Phillips v. Mathews*, 547 F.3d 905, 912 (8th Cir. 2008); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-06 (1973).  Womack must first establish a prima facie case, which requires her to "show that she exercised rights afforded by the Act, that she suffered an adverse employment action, and that there was a causal connection between her exercise of rights

and the adverse employment action." *Smith,* 302 F.3d at 832.  If Womack does so, the burden shifts to the Defendants to come forward with evidence of a legitimate, nondiscriminatory reason for the adverse action.  *Id.* at 833.  Their burden "is not onerous and the showing need not be made by a preponderance of the evidence." *Wallace v. Sparks Health Sys.,* 415 F.3d 853, 860 (8th Cir. 2005).  If Defendants do so, Womack must come forward with evidence that creates an issue of fact as to whether the asserted reason was pretext for discrimination.  *Smith,* 302 F.3d at 833.

The parties do not dispute that Womack exercised rights afforded by the FMLA. Defendants contend, however, that Womack has not shown she suffered an adverse employment action.  Defendants assert that RCM could reassign accounts at any time and that Womack was aware of this fact.  Defendants also note that the FMLA does not entitle employees to any greater right to benefits or conditions of employment than if the employee had been continuously employed.  29 C.F.R. § 825.216(a).  Therefore, according to Defendants, because Womack had no right to service particular accounts, RCM's refusal to reassign her pre-FMLA leave accounts to her could not constitute retaliation.

The Court disagrees.  Though RCM had discretion to assign accounts to its staff as it saw fit, the FMLA prohibits an employer from using such discretion in a retaliatory manner.  Further, Womack contends she sought to service the accounts on which she worked prior to her FMLA leave, not better or more lucrative accounts.  Viewing the facts in the light most favorable to Womack, she returned from FMLA leave to find her pre-leave accounts reassigned, and her employer refused to reassign the accounts to her.

Instead, she was told to choose new accounts from which to build a portfolio, but her only option was to choose from accounts that had little or no economic activity. Womack feared she would not be able to generate sufficient income from those accounts and might even end up owing RCM money. At the same time, Mueller reminded her that she was being held accountable for meeting the sales metric according to which RCM measured all Account Executives. (Doc. No. 138 ¶ 2, Ex. 5g.)

Further, there is evidence in the record that the refusal to reassign the accounts was related to Womack's illness and subsequent FMLA leave. Womack's initial assignment to the Account Executive position may have been in part due to financial issues for RCM's Minnesota branch, but it also was proposed in connection with Mueller's concern that Womack would have insufficient "energy" for the job due to her cancer and treatment. (*Id.* ¶ 2, Ex. 3b.) Mueller characterized Womack as unproductive, but Womack asserts that she had never received negative feedback on her performance prior to her FMLA leave. Mueller also noted that if Womack intended to "leverage FMLA," he wanted to start the process of looking for a replacement for her. (*Id.* ¶ 2, Ex. 3e.) There is also an e-mail message Mueller sent to Schappert regarding Womack stating: "I just wish she would go away . . . ."[1] (*Id.* ¶ 2, Ex. 3n.) Therefore, the Court concludes that Womack has established a prima facie case of FMLA retaliation.

---

[1]     The Court is aware that e-mail is a difficult medium from an evidentiary perspective because e-mails do not always convey the full intended meaning of the writer and often the question of what an e-mail says and means becomes a question of witness credibility. At this stage of the case, however, the Court must view the facts and draw reasonable inferences in the light most favorable to Womack and may not make

(Footnote Continued on Next Page)

The burden next shifts to Defendants to show a legitimate, nonretaliatory reason for the decision not to return Womack's accounts.  The record reflects, however, inconsistencies between RCM's statements about its refusal to reassign the accounts at the time Womack returned and its current position regarding why this occurred.[2]  At the time Womack returned from leave, Mueller indicated that Womack's accounts were VMS accounts and that these accounts were no longer being assigned to Account Executives.  Now, however, Defendants contend that Womack's accounts were not reassigned to her "to ensure continuous full-time service while Womack worked" part-time.  (Doc. No. 128 ¶ 41.)  Defendants do not state what they intended to do with these accounts when Womack returned to full-time status.  Given that Defendants have offered inconsistent explanations, and viewing the facts in the light most favorable to Womack, she has established facts sufficient to survive summary judgment that the refusal to reassign her pre-FMLA accounts was related to her FMLA leave.

Womack also contends she suffered an adverse employment action because her working circumstances when she returned from FMLA leave were intolerable and, therefore, that she was constructively discharged in retaliation for her exercise of her FMLA rights.  Womack argues that her supervisors were hostile to her and treated her

(Footnote Continued From Previous Page)
credibility judgments.  Should this matter proceed to trial, the parties may make a full exposition regarding the evidentiary record.

[2]   There are other inconsistencies between the Defendants statements now and at the time events occurred.  For instance, Defendants argue that Womack had few contacts through which to sell RCM services, though in an e-mail in July 2006, Mueller notes that Womack "ha[d] so many relationships in the Twin Cities."  (Doc. No. 138 ¶ 2, Ex. 5b.)

poorly when she returned.  She notes she was prohibited from discussing her health with her co-workers, she was made to check in about her whereabouts during the day but was chided when she did so, and she was ignored when she attempted to make contributions during staff meetings.  Defendants argue that these circumstances are insufficient to support Womack's claim of constructive discharge.

In order to establish a claim of constructive discharge, an employee must show that the employer created intolerable working conditions with the intention of forcing the employee to resign or that the employer could reasonably foresee that its actions would result in the employee's resignation.  *Pribil v. Archdiocese of St. Paul & Minneapolis,* 533 N.W.2d 410, 412-13 (Minn. Ct. App. 1995).  The employer's intent "can be proven with direct or circumstantial evidence, or it can be inferred upon a showing that the employee's resignation was a reasonably foreseeable result of the employer's conduct." *Id.* at 413.  Whether the conditions were in fact intolerable for the employee are judged by a reasonable-person standard.  *Diez v. Minn. Mining & Mfg.,* 564 N.W.2d 575, 579 (Minn. Ct. App. 1997).

If Womack's only evidence in support of her constructive discharge argument was that she was treated poorly upon her return, the Court would agree with Defendants. Being ignored in meetings, prohibited from discussing her health condition, and micromanaged, are actions which would be considered in turn unprofessional, somewhat strange, and unpleasant; they are, however, insufficient to amount to constructive discharge.  *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 652 (5th Cir. 2004) (concluding that employee showed she was ostracized and micromanaged, but that

employer's actions did not rise to the level of badgering or harassment required for a

constructive discharge claim).  Womack, however, also alleges that RCM interfered with

her ability to meet her quotas by refusing to reassign her pre-FMLA leave accounts, that

it would have been difficult to earn her commission, and that she could possibly have

owed RCM money.  The Court concludes that a reasonable person would find this

circumstance intolerable.[3]  Though not leading directly to a finding of constructive

discharge, the other hostile actions Womack alleges are persuasive evidence of RCM's

intent and the connection between its actions and her FMLA leave.

Defendants also argue that Womack's constructive discharge argument must fail

because she did not give RCM a reasonable opportunity to correct the problem.  To

successfully claim constructive discharge, an "employee must give her employer a

reasonable opportunity to work out the problems prior to resigning."  *Hanenburg v.*

*Principal Mut. Life Ins. Co.,* 118 F.3d 570, 575 (8th Cir. 1997).  Defendants contend that

Womack did not attempt to work out the problems she experienced at RCM prior to

giving her notice.  The record, however, contains evidence that Womack and RCM

negotiated back and forth several times regarding the proposed account list, that Womack

made clear that she was concerned about the assignment of accounts, and that she felt that

RCM was making it difficult for her to create a financially plausible portfolio of

---

[3]    Defendants submit the same arguments in response to both Womack's state law
constructive discharge claim and her claim that she was constructively discharged as an
adverse employment action under the FMLA.  The Court addresses these arguments in
the context of its FMLA analysis and, finding that Womack has sufficiently shown
constructive discharge, does not address these arguments again independent of the FMLA
claims.

accounts.  Ultimately, for almost a month after Womack returned, the parties were unable to reach an agreement regarding the most basic aspects of Womack's employment – her clients, her sales quota, and her compensation.  The Court concludes that Womack provided the Defendants with sufficient notice that there was a problem that needed attention.

### III.    Claims Against Schappert

In addition to asserting claims against RCM, Womack has also brought claims against Schappert individually.  Defendants argue that Womack's claims against Schappert should be dismissed because he cannot be considered an "employer" under the FMLA.

Under the FMLA, the term "employer" includes "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer . . . ." 29 U.S.C. § 2611(4)(A)(ii)(I); *see also* 29 C.F.R. § 825.104(a) ("Employers covered by [the] FMLA also include any person acting, directly or indirectly, in the interest of a covered employer to any of the employees of the employer").  In *Darby*, the Eighth Circuit held the plain language of the FMLA permits suit against persons other than the employing entity and subjects such individuals to personal liability.  287 F.3d at 681.

The FMLA regulations also note that:

> The definition of "employer" in section 3(d) of the Fair Labor Standards Act (FLSA), 29 U.S.C. 203(d), similarly includes any person acting directly or indirectly in the interest of an employer in relation to an employee.  As under the FLSA, individuals such as corporate officers "acting in the interest of an employer" are individually liable for any violations of the requirements of FMLA.

29 C.F.R. § 825.104(d).  Both the FLSA and the FMLA define the term employer in

broad terms.  In considering the definition of employer under the FLSA, courts examine

whether the alleged employer possessed the power to control the workers in question,

with an eye to the "economic reality" presented by the facts of each case.  *Goldberg v.*

*Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961).  The economic realities test takes

into account "the real economic relationship between the employer who uses and benefits

from services of workers and the party that hires or assigns the workers to that

employer."  *Ansoumana v. Gristede's Operating Corp.,* 255 F. Supp. 2d 184 (S.D.N.Y.

2003).  No single economic factor is dispositive.  *Dole v. Elliott Travel & Tours, Inc.,*

942 F.2d 962, 965 (6th Cir. 1991).  Instead, the economic reality test encompasses the

totality of the circumstances and any relevant evidence may be examined so as to avoid

having the test confined to a narrow legalistic definition.  *Rutherford Food Corp. v.*

*McComb,* 331 U.S. 722, 730 (1947) (whether an employer-employee relationship exists

does not depend on isolated factors but rather "upon the circumstances of the whole

activity").  A number of courts have applied the economic reality test used in connection

with the FLSA in FMLA cases.  *See Brunelle v. Cytec Plastics, Inc.,* 225 F. Supp. 2d 67

(D. Me. 2002) (front-line supervisor who was personally responsible for decisions that

contributed to denial of FMLA leave was not prominent enough player in employer's

operations to be considered an employer under the FMLA); *Kilvitis v. County of Luzerne*,

52 F. Supp. 2d 403 (M.D. Pa. 1999) (holding plaintiff stated an FMLA claim by

producing facts that judge had control over her employment when he personally wrote

the termination letter); *Fegley v. Higgins,* 19 F.3d 1126 (6th Cir. 1994) (an officer with

operational control of a corporation's covered enterprise is an employer under the FLSA and, by extension, an officer of a corporation also may be held jointly and severally liable with a corporation for violations of the FMLA).

Here, though Schappert was involved in actions that a jury could find interfered with Womack's FMLA rights or constituted retaliation for her exercise of those rights, Womack has not shown that Schappert was in charge of the operations of RCM to the degree necessary to subject him to personal liability.  Schappert did not have the power to hire and fire RCM workers.  Further, the record reflects that much of Schappert's negotiation and interaction with Womack was directed by, or conducted in consultation with, RCM's human resources staff members.  The Court concludes, therefore, that Womack's claims against Schappert should be dismissed.

## CONCLUSION

The Court concludes that disputed issues of material fact exist with respect to Womack's claims under the FMLA and for constructive discharge, precluding summary judgment.  The Court, therefore, denies Defendants' motion as to these claims.  The Court concludes, however, that Schappert cannot be considered an employer under the FMLA.  Therefore, the Court grants the Defendants' motion as to Womack's claims against Schappert and dismisses such claims.

Accordingly, **IT IS HEREBY ORDERED** that:

1.     The Defendants' Motion for Summary Judgment (Doc. No. 40) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      Defendants' motion is **DENIED** as to Plaintiff's claims

against Defendant RCM Technologies (USA), Inc.;

b.      Defendants' motion is **GRANTED** with respect to Plaintiff's

claims against James Schappert and such claims are **DISMISSED WITH**

**PREJUDICE.**


Dated:  December 23, 2008              s/Donovan W. Frank
                                       DONOVAN W. FRANK
                                       Judge of United States District Court